[Cite as *In re J.C.*, 2013-Ohio-3116.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| IN THE MATTER OF: | : | JUDGES: |
| | : | |
| J.C. | : | |
| | : | Hon. W. Scott Gwin, P. J. |
| | : | Hon. Sheila G. Farmer, J. |
| | : | Hon. Craig R. Baldwin, J. |
| | : | |
| | : | |
| | : | |
| | : | Case No. 2013CA00056 & |
| | : | 2013CA00061 |
| | : | |
| | : | |
| | : | O P I N I O N |

CHARACTER OF PROCEEDING: Appeal from the Stark Court of Common Pleas, Family Court Division, Case No. 2011JCV00094

JUDGMENT: Affirmed

DATE OF JUDGMENT: July 15, 2013

APPEARANCES:

For Plaintiff-Appellee

JERRY COLEMAN
Legal Counsel
Stark County JFS
221 Third Street SE
Canton, OH 44702

For Defendant-Appellant M.S.

AARON KOVALCHIK
116 Cleveland Ave. N.W.
Suite 808
Canton, OH 44702

For Defendant-Appellant S.C.

DAVID L. SMITH
245 33rd St. N.W.
Canton, OH 44709

*Baldwin, J.*

{¶1}    Appellants S.C. and M.S. appeal from the February 27, 2013 Judgment Entry of the Stark County Court of Common Pleas, Family Court Division, terminating their parental rights and granting permanent custody of J.C. to Stark County Department of Job and Family Services.

STATEMENT OF THE FACTS AND CASE

{¶2}    Appellant S.C. and appellant M.S. are the parents of J.C. (DOB 1/10/11). On January 19, 2011, Stark County Department of Job and Family Services (SCDJFS) filed a complaint alleging that J.C. was a dependent and neglected child. The complaint alleged that appellant M.S., the mother, had previously had a child adjudicated abused in Case No. 2007 JCV 00872 and that such child had been placed in the permanent custody of the agency. The complaint further alleged that appellant S.C., the father, had past involvement with the agency in a case and that the two children in such case were currently in the temporary custody of the agency. J.C. was placed in the temporary custody of SCDJFS. An adjudication/disposition hearing was scheduled for February 16, 2011.

{¶3}    At the February 16, 2011, hearing, the parties stipulated to a finding of dependency and the allegations of neglect were deleted. As memorialized in a Magistrate's Decision that was filed on February 18, 2011 and approved by the trial court,  J.C. remained in the temporary custody of SCDJFS.

{¶4}    Subsequently, on December 20, 2012, SCDJFS filed a motion seeking permanent custody of J.C.   A hearing on the motion was held on February 19, 2013.

{¶5} At the hearing, Wanda Pounds testified that she was employed by SCDJFS and was the family caseworker. Pounds testified that the agency became involved with J.C. shortly after his birth over concerns that he was a premature baby and appellant M.S. previously had lost custody of another child while appellant S.C. was involved with the agency with two other children. Pounds testified that on February 16, 2011, J.C. was placed in the temporary custody of the agency and that he had remained in the agency's temporary custody since such time.

{¶6} According to Pounds, the parties' case plan and subsequent amendments to the same required them to complete psychological parenting assessments at Northeast Ohio Behavioral Health, to participate in individual counseling, to have assessments for medications and to participate in the Goodwill Parenting Program. The plan also required appellant S.C. to receive a drug and alcohol evaluation at Quest and to follow all recommendations. Pounds testified that there were concerns about depression and anxiety issues with respect to both appellants. In addition, appellant S.C.'s plan required him to attend at least 3 twelve step meetings a week. Pounds further testified that appellant S.C. had two other children who were the subject of agency involvement and that, in that case, the children were placed in the legal custody of appellant S.C.'s mother. She indicated that appellant S.C., in such case, had a chance to work on a case plan and that it was her understanding that he did not.

{¶7} Appellant S.C. obtained the Quest assessment as required by his case plan and followed recommendations that he participate in Quest services. Pounds testified that appellant S.C., who had past problems with substance abuse, submitted to random drug screens and that there were no concerns about current drug use. She

further testified that appellant S.C. had obtained a medication assessment and was currently on medication, although she did not know the name of the medication.

{¶8} Pounds also testified that appellant M.S. was on medication and was going regularly to a therapist. Both parents attended Goodwill Parenting. While appellant M.S. got a certificate of participation, Goodwill noted that they had to provide constant supervision to her and that they had "grave concerns about her ability to problem solve and to spontaneously respond to the special needs of [J.C.]." Transcript at 10. She testified that he had a condition that affects his lymphatic system and causes painful swelling. J.C. also has a respiratory condition and requires breathing treatments and could have an asthma attack very easily. Appellant M.S., according to evaluations, has the cognitive ability of an eight year old. Pounds testified that when J.C. paid too much attention to someone else, appellant M.S. would pout and get upset. She indicated that she had concerns over appellant M.S's ability to meet J.C.'s day to day needs because J.C. was very active and appellant M.S. was easily distracted. Pound also testified that J.C. requires daily massages and she was unsure if appellant M.S. was really aware of what that entailed.

{¶9} While appellant M.S. was actively involved in J.C.'s medical appointments, appellant S.C. was not and attended sporadically due to his work schedule. Pounds testified that they were never able to obtain verification of appellant S.C.'s work and that, in her opinion, he did not recognize appellant M.C.'s limitations and became frustrated with her. Appellants were very short with each other and Pounds testified that because of J.C.'s medical issues, appellants had to work together. When asked, she testified that appellants had attended what their case plan required them to, but had not

done well because they did not retain information. She further testified that while appellant M.S. consistently attended family visits, appellant S.C. had not and had missed a majority prior to his participation in the Northeast Ohio Parenting Program. Since attending the program, he had done better, but had missed a couple of visits. Pounds, when asked if the risks that were present at the beginning of the case had been reduced, stated that they had not. She testified that she had made sure that appellants had bus passes and offered to give them rides to places to help them complete their case plan and that she had rearranged visits to accommodate them. She further testified that in July of 2012, appellant S.C. was charged with menacing and she was concerned with his anger issues.

{¶10} On cross-examination, Pounds testified that appellant M.S. had completed Goodwill Parenting and had retained an average amount of information and that she had completed the parenting assessment. Pounds testified that the majority of her concerns were not related to appellant M.S.'s completion of case plan services, but rather with outside issues such as her relationship with appellant S.C. She indicated that no one believed that appellant M.S. could do it on her own, but that there was no concern that she could not provide food, shelter or clothing to J.C. or get him to medical appointments. Pounds agreed that there was never a referral made to MRDD to help appellant M.S. with case plan services. Pounds further testified that appellants currently lived together. Pounds stated that appellant M.S. did not have the cognitive ability to parent J.C. even though appellant M.S. paid her own rent, attended appointments, went grocery shopping and prepared meals, and completed training in CPR.

{¶11} On cross-examination, Pounds testified that appellant S.C. did fairly well at Goodwill and that the only recommendation was individual counseling, which he continued attending. She further testified that appellant S.C. was working during the day under the table for a construction company and that because he was then working the afternoon shift, he was able to attend more medical appointments for J.C. She agreed that there had always been concern about the stability of the relationship between appellants. On redirect, Pounds testified that the Intensive Parent Child Interaction program therapist did not recommend that J.C. be returned home and did not recommend a move to unsupervised visitation.

{¶12} Dr. Amy Thomas of Northeast Ohio Behavioral Health testified that appellant M.S. completed a parenting evaluation with her. She testified that she had concerns about the agency's' previous involvement with appellant M.S. and the circumstances of the same. She testified that appellant M.S. had tolerated abuse in a previous relationship and lied in such case when she told law enforcement that she had injured her 6 week old child when she had not. Dr. Thomas questioned appellant M.S.'s processing and judgment and noted that appellant M.S. remained with the perpetrator of the abuse for another six months. The child in such case had a number of broken bones. Appellant M.S. was convicted of obstruction.

{¶13} Dr. Thomas also testified that appellant M.S. indicated that she was concerned with appellant S.C.'s addiction to marijuana and his fixation with playing video games and was concerned that he would not help her financially. She testified that appellant M.S.'s full scale IQ was 63 and that she was functioning at the level of an eight year old in terms of verbal and non-verbal skills. Dr. Thomas stated that she was

concerned about her ability to understand medical directives and her limitations in judgment, reasoning and processing information. She opined that appellant M.S.'s parenting difficulties would increase as J.C. became older and required more assistance. She did not believe that appellant S.C. was a strong support system for appellant M.S.

{¶14} Dr. Thomas diagnosed appellant M.S. with dependent personality disorder and indicated that this meant that she was going to tolerate dysfunctional unhealthy relationships. She voiced concerns over appellant M.S.'s stubbornness and ability to accept feedback. Appellant M.S. also was diagnosed with major depressive disorder, irritability and mood swings. She also has anger management issues with yelling and screaming. Dr. Thomas indicated that appellant's diagnoses would affect every aspect of her parenting ability and that depression would negatively affect her cognitive ability. Appellant M.S., according to her, was unable to address more complicated issues. When asked her recommendations, Dr. Thomas testified that she did not believe that appellant M.S. could independently parent J.C. She had strong reservations about offering recommendations for services due to appellant M.S.'s low intellectual functioning and lack of a strong support system.

{¶15} Dr. Thomas also was questioned about appellant S.C. She testified he completed a parenting evaluation with her and that his previous involvement with the agency caused her concern. She noted that appellant S.C., in his previous case, was not actively involved in maintaining contact with his children and that his level of involvement with them was lacking. She testified that appellant S.C. had no sense of appellant M.S.'s limitations, but that he was forthcoming about his past substance

abuse. Appellant S.C. reported that he had abused alcohol in the past and reported that his use of marijuana was very problematic. According to him, appellant M.S. did not support him in maintaining his sobriety, appeared to sabotage him and was jealous that he might meet someone at a twelve step meeting. Dr. Thomas testified that appellant S.C. was functioning in the below average range of intellectual ability and that use of marijuana would compromise him intellectually. He did not understand that appellant M.S. was unable to independently parent J.C.

{¶16} Appellant S.C. reported that he had one or two domestic violence charges and that he was addicted to playing video games. Dr. Thomas testified that this playing impacted his relationship with appellant M.S. and that as a result of his game playing, he did not visit with J.C. as often as he could have. She voiced concerns that he would not be able to attend to J.C.'s needs due to his obsession with video games. Dr. Thomas diagnosed appellant S.C. with major depressive disorder and features of borderline personality disorder and testified that he had very poor coping skills and had engaged in superficial cutting. According to her, he was immature, lazy and unmotivated. She opined that the her prognosis for his ability to care for J.C. was "guarded at best." Transcript at 53.

{¶17} The next witness to testify was Amy Humrighouse, a parenting instructor at Goodwill Parenting. She testified that appellant M.S. received a certificate of completion and had perfect attendance, but that there were concerns about visitation. Appellant M.S. according to her, did not appear comfortable dealing with J.C.'s medical issues and would panic when his heart monitor went off. She also needed assistance with changing diapers. Humrighouse voiced concerns over appellant M.S.'s ability to

care for J.C. for the long term because he was fragile and had medical and developmental issues. Humrighouse also voiced concerns that appellant M.S. did not make changes in her relationships and did not establish independent housing, but had stayed with friends. She indicated that she had concerns with her ability to independently parent J.C. and would not feel comfortable making any recommendations for unsupervised contact.

{¶18} Jen Fire, also a parenting instructor at Goodwill Parenting, testified that appellant S.C. attended the program and received a certificate of participation. She testified that there were still concerns with appellant S.C. Fire noted that although he was told that there would be a home inspection, there were safety concerns with appellant S.C.'s home. She also testified that she was concerned about issues between appellants who were in an off and on chaotic relationship. Fire testified that appellant S.C. was insistent that appellant M.S. would watch J.C. while he was at work, despite being advised of her limitations.

{¶19} On cross-examination Fire testified that appellant S.C. had a good bond with J.C. and was attentive to him. She testified that he acted appropriately during visits, which were supervised, and that if the monitors on J.C. went off, he would handle the matter. Fire indicated that she believed that appellant S.C. had anger issues that he needed to address.

{¶20} Becky Crookston, a therapist with Northeast Ohio Behavioral Health, testified that she does the IPCI (Intensive Parent Child Interaction) program and that both appellants had come to her program the previous summer. She indicated significant concerns existed about the parties' relationship because appellant S.C. was

very dominant and was demanding. She indicated that she was concerned that appellant S.C. might be able to see J.C.'s needs, but be unable to meet the same and then expect appellant M.S. to do so. According to Crookston, appellant M.S. personalized the child's interactions and responded in the manner of an immature child. She testified that she was concerned that appellant M.S. might put her own needs or those of appellant S.C. over J.C.'s needs. Crookston also was worried that appellants did not present a unified front and were forgetting J.C'.s needs even when others were around. Crookston also testified that she was concerned that appellant S.C. had anger issues as evidenced by his report of taking a baseball bat to his employer's home or building. She believed that he did not have the ability to cope with problems. Appellants did not successfully complete the program because they were too focused on their own individual problems. She indicated that she was concerned that appellants did not have the ability to care for J.C. because of appellant S.C.'s violent tendencies, the conflict in their relationship, and because appellant S.C. was demanding and appellant M.S. shut down. She could not recommend that the parents be unsupervised with any baby.

{¶21} At the best interest hearing, Wanda Pounds testified that J.C. was two years old and was born two months premature. She testified that he suffered from Milroy's disease and that such disease causes a lot of swelling in his body. As a result, J.C. requires a diet low in salt and also has to be massaged every morning after his bath to "help things get moving." Transcript at 98. She testified that he is involved with physical and speech therapy. Pounds further testified that J.C. is in foster care and is in a foster home that specialized in receiving children with special needs. The foster

parents have adopted special needs children in the past and have been trained to deal with medical devices. There are three other adopted children in the home and the family has a daughter with special needs who is in independent living. Pounds testified that J.C. got along well with the other children, that he was bonded with the family, and that the foster family was interested in adoption. Pounds further testified that there was a bond between appellants and J.C., but that she believed that permanent custody was in his best interest because appellants did not completely understand his needs and were not completely able to attend to them. She testified that J.C. needed permanency and that she did not believe that any more time would make a difference.

{¶22} On cross-examination, Pounds testified that she never asked appellants about relative placements and that appellant S.C.'s mother never contacted her. On redirect, she testified that she was confident that alternative relative placement had been addressed.

{¶23} Appellant M.S. testified at the hearing and described Milroy's disease and how massage helped J.C. She testified that he saw a total of six doctors including an eye doctor and that she had been to all of his medical appointments. Appellant M.S. testified that she was certified in CPR and that she could handle an emergency situation. On cross-examination, she testified that J.C. has asthma, that both appellants smoked and that there was a dog in the home. She indicated that they smoked outside. Appellant M.S. also testified that her home was ready for J.C.

{¶24} Pursuant to a Judgment Entry filed on February 27, 2013, the trial court terminated appellants' parental rights and granted permanent custody of J.C. to SCDJFS. The trial court, in its Judgment Entry, found that J.C. could not be placed with

either parent at the present time or within a reasonable time and should not be placed with either parent and that he had been in the custody of SCDJFS for 12 or more months in a consecutive 22 month period. The trial court also found that appellant M.S. had previously had her parental rights divested with respect to another child. Moreover, the trial court found that it was in his best interest for permanent custody to be granted to the agency. Findings of Fact and Conclusions of Law were filed the same day.

{¶25} Appellant M.S. appealed from the trial court's February 27, 2013 Judgment Entry, raising the following assignments of error on appeal:

{¶26} THE JUDGMENT OF THE TRIAL COURT THAT THE MINOR CHILD CANNOT OR SHOULD NOT BE PLACED WITH APPELLANT WITHIN A REASONABLE TIME WAS AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE.

{¶27} THE JUDGMENT OF THE TRIAL COURT THAT THE BEST INTERESTS OF THE MINOR CHILD WOULD BE SERVED BY THE GRANTING OF PERMANENT CUSTODY WAS AGAINST THE MANIFEST AND SUFFICIENCY OF THE EVIDENCE.

{¶28} Her case has been assigned Case No. 2013 CA 00056.

{¶29} Appellant S.C. also appealed from the trial court's February 27, 2013 Judgment Entry, raising the following assignment of error on appeal:

{¶30} THE TRIAL COURT ERRED IN AWARDING PERMANENT CUSTODY TO THE STARK COUNTY DEPARTMENT OF JOBS AND FAMILY SERVICES AS ITS FINDING THAT THE BEST INTERESTS OF THE CHILD WERE SERVED BY SUCH WEIGHT AND SUFFICIENCY OF THE EVIDENCE.

{¶31} His case has been assigned Case No. 2013 CA 00061.

{¶32} For purposes of judicial economy, we shall address the two cases together.

**Assignments of Error in Case No. 2013 CA 00056 and Assignment of Error in Case No. 2013 CA 00061**

{¶33} Appellant M.S., in her first assignment of error in Case No. 2013 CA 00056, argues that the trial court's finding that J.C. could not and should not be placed with her within a reasonable time was against the manifest weight and sufficiency of the evidence. Appellant M.S., in her second assignment of error in Case No. 2013 CA 00056, and appellant S.C., in his sole assignment of error in Case No. 2013 CA 00061, argue that the trial court's finding that J.C.'s best interest would be served by the granting of permanent custody was against the manifest weight and sufficiency of the evidence.

{¶34} As an appellate court, we are not fact finders; we neither weigh the evidence nor judge the credibility of witnesses. Our role is to determine whether there is relevant, competent, and credible evidence upon which the fact finder could base his or her judgment. *Cross Truck v. Jeffries,* 5th Dist. No. CA–5758, 1982 WL 2911 (Feb. 10, 1982). Accordingly, judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Construction,* 54 Ohio St.2d 279, 376 N.E.2d 578 (1978).

{¶35} Issues relating to the credibility of witnesses and the weight to be given to the evidence are primarily for the trier of fact. *Seasons Coal v. Cleveland,* 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). Deferring to the trial court on matters of credibility is "crucial in a child custody case, where there may be much evidence in the parties'

demeanor and attitude that does not translate to the record well." *Davis v. Flickinger,* 77 Ohio St.3d 415, 419, 1997-Ohio-260, 674 N.E.2d 1159.

{¶36} R.C. 2151.414 sets forth the guidelines a trial court must follow when deciding a motion for permanent custody. R.C. 2151.414(A)(1) mandates the trial court schedule a hearing and provide notice upon the filing of a motion for permanent custody of a child by a public children services agency or private child placing agency that has temporary custody of the child or has placed the child in long-term foster care.

{¶37} Following the hearing, R.C. 2151.414(B) authorizes the juvenile court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency, and that any of the following apply: (a) the child is not abandoned or orphaned, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned and there are no relatives of the child who are able to take permanent custody; or (d) the child has been in the temporary custody of one or more public children services agencies or private child placement agencies for twelve or more months of a consecutive twenty-two month period.

{¶38} In determining the best interest of the child at a permanent custody hearing, R.C. 2151.414(D) mandates the trial court must consider all relevant factors, including, but not limited to, the following: (1) the interaction and interrelationship of the child with the parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with due regard

for the maturity of the child; (3) the custodial history of the child; and (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody.

{¶39}   Therefore, R.C. 2151.414(B) establishes a two-pronged analysis the trial court must apply when ruling on a motion for permanent custody. In practice, a trial court will usually determine whether one of the four circumstances delineated in R.C. 2151.414(B)(1)(a) through (d) is present before proceeding to a determination regarding the best interest of the child.

{¶40}   In the case sub judice, the trial court found by clear and convincing evidence that the child had been in the temporary custody of a public children services agency for twelve or more months of a consecutive twenty-two month period pursuant to R.C. 2151.414(B)(1)(d). Appellants do not challenge the trial court's finding. This finding alone, in conjunction with a best-interest finding, is sufficient to support the grant of permanent custody. *In re Calhoun,* 5th Dist. No.2008CA00118, 2008–Ohio–5458, ¶ 45.

{¶41}   If the child is not abandoned or orphaned, the focus turns to whether the child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents. Under R.C. 2151.414(E), the trial court must consider all relevant evidence before making this determination. The trial court is required to enter such a finding if it determines, by clear and convincing evidence, that one or more of the factors enumerated in R .C. 2151.414(E)(1) through (16) exist with respect to each of the child's parents.

{¶42} The trial court determined that the child could not be placed with appellants within a reasonable time pursuant to R.C. 2151.414(E)(1), which requires the following findings:

"(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties."

{¶43} A review of the record supports the trial court's decision that the child could not and should not be placed with appellants within a reasonable time. As noted by the trial court, appellant M.S., who functions at the level of an eight year old, had previously lost another child to the permanent custody of SCDJFS and appellant S.C. had been involved with the agency in a case in which two of his children were placed in the custody of a relative. In addition, at the hearing, testimony was adduced that appellant M.S. lacked judgment, reasoning and the ability to make good choices and was not able to independently care for J.C. Appellant M.S. was functioning at the level of an eight year old and lacked a strong support system. She was unable to parent

J.C. without supervision. In addition, testimony was adduced that appellant S.C. was addicted to marijuana and fixated on video games. Testimony was adduced that he did not understand appellant M.S.'s limitations and that appellant M.S. did not support him in his attempts to abstain from drug use. Both appellants were terminated from the Intensive Parent Child Interaction Program because of their inability to make progress in the curriculum due, in part, to their conflict-filled relationship.   Both appellants were diagnosed with mental health disorders.

{¶44}   We further find that the trial court did not err in finding that it was in J.C.'s best interest for permanent custody to be granted to the agency. At the best interest hearing, Wanda Pounds testified that J.C. was placed in a foster home that was versed in children with special needs and was doing well. The foster family has three other children of their own currently in  their home and expressed an interest in adopting J.C. Pounds testified that J.C. was bonded with his foster family and that  she believed that permanent custody was in his best interest because appellants did not completely understand his needs and were not completely able to attend to them.  She testified that J.C. needed permanency and that she did not believe that any more time would make a difference.

{¶45}   Based on the foregoing, we find that the trial court's finding that J.C.'s best interest would be served by the granting of permanent custody was not against the manifest weight or sufficiency of the evidence.

{¶46}   Appellant M.S.'s two assignments of error and appellant S.C. sole assignment of error are, therefore, overruled.

{¶47} Accordingly, the judgment of the Stark County Court of Common Pleas, Family Court Division, terminating appellants' parental rights and granting permanent custody of J.C. to Stark County Department of Job and Family Services is affirmed.

By: Baldwin, J.

Gwin, P J. and

Farmer, J. concur.

_____
HON. CRAIG R. BALDWIN


_____
HON. W. SCOTT GWIN


_____
HON. SHEILA G. FARMER


CRB/dr

[Cite as *In re J.C.*, 2013-Ohio-3116.]

IN THE COURT OF APPEALS FOR STARK COUNTY, OHIO

FIFTH APPELLATE DISTRICT

IN THE MATTER OF:                    :
                                     :
      J.C.                           :
                                     :
                                     :      JUDGMENT ENTRY
                                     :
                                     :
                                     :
                                     :
                                     :      CASE NO. 2013CA00056

     For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Stark County Court of Common Pleas, Family Court Division, is affirmed. Cost assessed to appellants.


_____
HON. CRAIG R. BALDWIN


_____
HON. W. SCOTT GWIN


_____
HON. SHEILA G. FARMER